UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| | | |
|---|---|---|
| CHRISTINE BENNETT, et al., | ) ) | |
| Plaintiffs, | ) ) | Civil No. 15-30-ART |
| v. | ) ) | |
| BANK OF AMERICA, N.A., et al., | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Christine and Earl Bennett bought their home at the height of the housing bubble. Like thousands of other Americans, the Bennetts thought they were getting a great deal on the home of their dreams. But shortly after they signed their mortgage contract, the Bennetts found themselves unable to keep up with the monthly payments. Bank of America, their loan servicer at the time, instituted foreclosure proceedings against the Bennetts, and the state court placed the Bennetts' home in foreclosure. Since the foreclosure judgment, the Bennetts have desperately tried to keep their home, sending numerous applications for loan modifications to both Bank of America and Rushmore, the new servicer of the loan. But the Bennetts believe that Bank of America and Rushmore wrongfully denied them certain loss mitigation options that would have helped them keep their home. The Bennetts reached out to the Kentucky Attorney General's Office for help, but the Bennetts allege that Bank of America and Rushmore still refused to provide them with the information they needed to pursue their loan modification options effectively. So the Bennetts resorted to the only

option they have left: they brought suit in federal court.  Unfortunately for the Bennetts, they fail to allege sufficient facts to state most of their claims against the defendants.

## BACKGROUND

The Bennetts allege the following facts in their amended complaint, R. 28:  On July 25, 2007, the Bennetts entered a mortgage contract for $115,090 with Taylor, Bean & Whitaker Mortgage Corporation ("TBW").  R. 29-1 at 1 (mortgage contract).  The Bennetts quickly began struggling to make their monthly mortgage payments.  TBW offered the Bennetts a forbearance agreement to help them make their payments.  R. 28 ¶ 19.  But the Bennetts continued to struggle, and, in May 2009, they started to default on their loan.  R. 29-4 at 2 (state court foreclosure judgment).  By the end of the year, the Bennetts' loan was in default because they were still unable to make a complete mortgage payment.  *See id.* at 3.  So Bank of America ("BANA"), which became the servicer of the loan earlier that year, initiated a foreclosure proceeding against the Bennetts in Kentucky state court.  R. 28 ¶ 13; *see also* R. 29-3 (state court complaint).  On September 27, 2010, the state court ordered the property foreclosed and issued an order of sale.  *See* R. 29-4.  The Bennetts' loan has been in foreclosure since the state court decision, but the property has not been sold.  R. 28 ¶¶ 14–15.  In 2013, BANA transferred the servicing of the Bennetts' loan to defendant Rushmore Loan Management Services LLC ("Rushmore").  *Id.* ¶ 16.  BANA sold the ownership of the Bennetts' loan to defendant MTGLQ Investors, LP ("MTGLQ").  *Id.* ¶ 17.  BANA notified the Bennetts of the transfers in servicing and ownership.  *Id.* ¶¶ 16–17.

The Bennetts have been attempting to get loan modifications to help them keep their house since the foreclosure action began.  *Id.* ¶ 18.  In 2010, BANA reached out to the Bennetts about their possible eligibility in the Home Affordable Modification Program

("HAMP"), a government loan modification program in which BANA participates. *Id.* ¶ 19. From 2010 to early 2013, the Bennetts sent BANA "various" loss mitigation applications that were "either misplaced or never fully responded to." *Id.* ¶ 20.  BANA sent the Bennetts a letter in April 2013 stating that they had been declined for a loan modification, R. 28-3 at 1 (subsequent letter referencing April 2013 declination letter), but the Bennetts never received the declination letter. R. 28 ¶¶ 21, 58.  Shortly thereafter, the Bennetts engaged Emery Law ("Emery") for assistance with loss mitigation. *Id.* ¶ 22.  From November 2013 to July 2014, Emery or its subcontractor Friedman Law ("Friedman") submitted four loss mitigation applications to Rushmore. *Id.* ¶ 24.  Two of these applications were approved for a forbearance agreement, one was not processed, and one was declined for lack of documentation. *Id.*  The Bennetts claim that neither Emery nor Friedman were notified of the declination or the reasons for it. *Id.*

On June 25, 2014, Rushmore approved the Bennetts for their second forbearance agreement. *Id.* ¶ 25; R. 28-1 (forbearance agreement).  The agreement required the Bennetts to pay a lump sum of $12,500 followed by six monthly payments of $1250 before their loan would be reviewed for a final loss mitigation plan. R. 28 ¶ 25; R. 28-1 at 4.  The Bennetts received this offer from Emery in July, and the Bennetts claim it was the same forbearance offer they had received from Rushmore six months earlier. R. 28 ¶ 26.  The Bennetts told Emery to reject the offer and to request that Rushmore review their loan for additional loan modification options. *Id.*

At this point, the Bennetts were desperate to get a loan modification that would help them keep their home.  So they submitted a written complaint to the Kentucky Attorney General's Office ("AG") seeking an inquiry and evaluation on the Bennetts' behalf. *Id.* ¶ 27.

3

Specifically, the Bennetts asked the AG to inquire into the status of their loan modification applications with Rushmore and the servicing practices of BANA. *Id.* The AG sent letters to BANA and Rushmore on the Bennetts' behalf, asking for the information the Bennetts requested. *Id.* ¶ 28. These letters contained the Bennetts' name, address, account number, and specific inquiries related to the loan account. *Id.* Both BANA and Rushmore responded to these letters. *Id.* ¶¶ 29, 32, 34; R. 28-2 (letter from Rushmore); R. 28-3 (first letter from BANA); R. 28-4 (second letter from BANA). The Bennetts argue that the responses from BANA and Rushmore were insufficient and contained misrepresentations. R. 28 ¶¶ 45–50, 78–80.

The Bennetts were unable to obtain a loan modification from Rushmore despite the involvement of the AG. R. 28 ¶¶ 35–36. Out of options, Christine Bennett filed a petition for relief under Chapter 13, Title 11 of the Bankruptcy Code on January 30, 2015. *Id.* ¶ 37. The bankruptcy case was dismissed a month later for failure to file documents. *Id.* ¶ 38. A week after the dismissal of the bankruptcy case, the Bennetts filed the instant complaint against BANA, Rushmore, and MTGLQ. *See* R. 1; R. 28 (amended complaint). Defendants BANA, Rushmore, and MTGLQ each moved to dismiss the claims against them for failure to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6). *See* R. 29–31.

### STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), the Court reviews whether the Bennetts' complaint alleges sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this standard, the Bennetts must plead enough facts that the court can draw a reasonable inference that the defendants are liable for the alleged misconduct. *Id.*

4

(citing *Twombly*, 550 U.S. at 556).  At this stage, the Court construes factual allegations "in the light most favorable to the plaintiff" and draws "all reasonable inferences in favor of the plaintiff." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 456 (6th Cir.2011) (quoting *In re Travel Agent Comm'n Antitrust Litig.*, 583 F .3d 896, 903 (6th Cir.2009)).

## DISCUSSION

### I.   BANA'S MOTION TO DISMISS

The Bennetts allege BANA: (1) violated the Real Estate Settlement Procedures Act ("RESPA"), 12 C.F.R. § 1024.36, by failing to respond reasonably to the Bennetts' qualified written requests; (2) breached the mortgage contract; and (3) breached the HAMP guidelines. R. 28, Counts I–III.  BANA moved to dismiss all three counts for failure to state a claim upon which relief may be granted.  *See* R. 29-5.  Only the Bennetts' RESPA claim survives.

#### a.   Count I: The Bennetts stated a claim under RESPA.

BANA contends that the plaintiffs' RESPA claim fails for two reasons:  First, the letters came from the Attorney General's office, not the Bennetts, so the letters did not qualify as Qualified Written Requests ("QWRs") under RESPA.  Second, BANA argues that the Bennetts' claim fails because they cannot show damages.  Both of these arguments fail.

The Bennetts pled sufficient facts to state a claim under RESPA.  BANA is correct that 12 C.F.R. § 1024.36 seems only to require services to respond to QWRs that come directly from borrowers.  *See* § 1024.36(a) ("A servicer shall comply with the requirements of this section for any written request for information from a borrower . . . .").  And the Bennetts admit that they did not send any letters directly to BANA. R. 47 at 3.  However, 12 C.F.R. § 1024.36 is a section of Regulation X, which is a set of regulations issued by the

Bureau of Consumer Financial Protection to implement RESPA, 12 U.S.C. § 2601 et seq.  12 C.F.R. § 1024.1.  RESPA's definition of whose letters qualify as QWRs is broader than the definition in Regulation X.  *Compare* 12 U.S.C. § 2605(e)(1)(A), *with* 12 C.F.R. § 1024.1. Section 2605 requires a servicer to respond to QWRs "from the borrower (or an agent of the borrower)." 12 U.S.C. § 2605(e)(1)(A).  Admittedly, the Bennetts do not cite to section 2605 in their complaint.  *See* R. 1.  They only cite to Regulation X to refer to RESPA.  *Id.* However, the failure to cite to the correct statute is not sufficient for dismissal.  *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346 (2014) ("Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.").  The Bennetts named RESPA in the complaint, and Regulation X expressly states that it implements RESPA.  *See* 12 C.F.R. § 1024.1.  So the Court will assess the complaint to determine if the Bennetts pled sufficient facts to satisfy the corresponding section in RESPA, § 2605(e)(1)(A).  *See Bowman v. United States*, 564 F.3d 765, 771 (6th Cir. 2008) ("Where Congress has spoken in unambiguous terms, the inquiry [into the meaning of the regulation] ends and the court must give effect to the unambiguously expressed intent of Congress." (internal quotations omitted)).

The question, then, is whether the AG qualifies as an "agent of the borrower" for the purposes of section 2605.  *Id.*  RESPA does not define the meaning of "agent," *see* § 2605(e)(1)(A); *see also* § 2602 (definitions), so the Court interprets "agent" "in accordance with [its] ordinary meaning." *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013) (internal quotation marks omitted).  In determining the ordinary meaning of "agent," dictionaries at the time of the enactment of section 2605(e) in 1990 provide a useful guide.  *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012).  The definitions of "agent" include,

in relevant part: "one that acts for or in the place of another by authority from him: as (a) a representative, emissary, or official of a government" or as "(e) a business representative." Webster's Third New Int'l Dictionary 40 (1976). *Black's Law Dictionary* defines "agent" similarly: "A person authorized by another to act for him, one intrusted [sic] with another's business." Black's Law Dictionary 59 (5th ed. 1979). So "agent" has both a broader meaning of a "representative" and a narrower meaning of a "business representative."

Section 2605 intends the broader meaning of the word "agent." When Congress wanted to use a narrower definition of "agent" within RESPA, it did so. For example, section 2607 refers to "duly appointed agent[s]." 12 U.S.C. § 2607(c). Appointed agents are official representatives, such as accountants or lawyers. *See, e.g.*, *Mutual Life Ins. Co. of N.Y v. Phinney*, 178 U.S. 327, 331 (1900) ("[T]he said premium or interest then due shall be paid to the company or to a duly appointed agent or other person authorized to collect such premium . . . ."). In section 2605, though, Congress chose to use the broader term "agent," suggesting that Congress intended the broader meaning. Moreover, section 2605 has nothing to do with business interests. Instead, section 2605, as part of RESPA, was established to protect the rights and interests of homeowners. *See* 12 U.S.C. § 2601; *see also Vega v. First Fed. Sav. & Loan Ass'n of Detroit*, 622 F.2d 918, 923 (6th Cir. 1980) (noting that Congress's intent in passing RESPA was "to insure that consumers throughout the Nation are provided with greater and more timely information" with respect to real estate transactions). Most homeowners are acting in an individual capacity, not a business capacity, when they engage in real estate transactions. So it seems unlikely that Congress intended the narrower, business-oriented meaning of the word agent.

The AG qualifies as the Bennetts' agent under section 2605.  Under a broad reading of "agent," any person who is authorized by a borrower to act on her behalf qualifies as an "agent" for the purposes of section 2605.  In this case, the Bennetts reached out to the AG to help them obtain information from BANA.  R. 28 ¶ 27.  The AG then sent the letters on the Bennetts' behalf.  *Id.* at ¶ 28.  These facts indicate that the Bennetts authorized the AG to act on their behalf by sending inquiries to BANA.  So treating the AG as the Bennetts' agent fits within the broad definition of "agent."  And BANA recognized that the AG was acting on the Bennetts' behalf—BANA addressed its response to Ms. Bennett and stated it was "responding to the email we received on [the Bennetts'] behalf" from the AG.  R. 28-3 at 1.

Finding the AG an agent of the Bennetts also comports with the purpose of section 2605.  First and foremost, RESPA is a consumer protection statute.  *See Vega*, 622 F.2d at 923.  As such, borrowers who are struggling to communicate effectively with servicers should be able to seek help or intervention from various government consumer protection agencies.  For example, the AG has a consumer protection division that helped the Bennetts in this case.  *See* R. 28-2 (Rushmore's response stamped by the AG's Consumer Protection Division).  Preventing these government agencies from being "agents" as defined by RESPA would impede RESPA's underlying purpose.

The only circuit to rule on this issue agreed with the broad reading of "agent." *Catalan v. GMAC Mortgage Corp.*, 629 F.3d 676 (7th Cir. 2011).  In *Catalan*, the plaintiffs sent a letter to the United States Department of Housing and Urban Development ("HUD") detailing the problems they were having with their mortgage servicer.  *Id.* at 682.  In the letter, the plaintiffs asked several questions about the servicing practices of both their loan servicers.  *Id.*  HUD forwarded the letter to the defendant.  *Id.*  The Seventh Circuit held that

HUD qualified as an "agent of the borrower" under RESPA, stating that an "agent" under RESPA includes "HUD's intercession on the plaintiffs' behalf." *Id.* at 688. The court emphasized that RESPA is a "consumer protection statute," and the plaintiffs reasonably sought HUD's help. *Id.* The court also pointed to the fact that the defendant's response "tacitly acknowledged that the letter was a request for information and raised a dispute with [plaintiffs'] account." *Id.* Following the reasoning in *Catalan*, the AG qualifies as the Bennetts' agent, and the AG's letters to BANA qualify as QWRs under section 2605.

BANA next argues that the Bennetts' RESPA claim should be dismissed because the Bennetts failed to plead damages adequately. R. 29-5 at 4–6. BANA claims that any inadequacies in their response to the AG's letter could not have damaged the Bennetts because BANA was no longer servicing the loan. *Id.* at 5. Moreover, BANA asserts that the Bennetts' claim does not contain sufficient facts for the pattern allegation the Bennetts are required to plead under RESPA. *Id.* at 6.

Under RESPA, plaintiffs are not required to plead damages with particularity. BANA is correct that under *Twombly*, a pleading must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action is not enough." 550 U.S at 555. However, the Sixth Circuit has held that to state a claim under section 2605, a plaintiff does not have to plead damages with particularity. *See Mellentine v. Ameriquest Mortg. Co.*, 515 F. App'x 419, 424–25 (6th Cir. 2013). In *Mellentine*, the plaintiffs alleged "damages in an amount not yet ascertained, to be proven at trial." *Id.* at 425. The district court dismissed the complaint for failure to plead actual damages or a pattern or practice of noncompliance as required by section 2605(f). *Id.* at 424. The Sixth Circuit reversed, holding that plaintiffs' statement of damages was sufficient to state a claim under section 2605 of RESPA. *Id.* at

425. The court reasoned that because the complaint adequately states a claim that the defendant violated section 2605(e), the plaintiffs' complaint "sufficiently sets forth facts upon which relief can be granted." *Id.*

Under *Mellentine*, the Bennetts adequately pled damages. In the complaint, the Bennetts detail how BANA's responses to the AG's letters were inadequate under section 2605(e). R. 28 ¶¶ 45–49. The Bennetts allege that BANA's inadequate responses hindered their ability to evaluate their past and present loss mitigation options based on the actual investor guidelines. R. 28 ¶ 48. The Bennetts also assert that BANA's actions are "a pattern and practice of behavior in conscious disregard for the Bennetts' rights." *Id.* ¶ 51. The Bennetts state that BANA is liable to them for "actual damages, statutory damages, costs and attorney's fees." *Id.* ¶ 52. Because the Bennetts adequately state a claim under section 2605(e) and assert they are seeking actual damages, statutory damages, and costs and attorney's fees, the Bennetts' complaint "sufficiently sets forth facts upon which relief can be granted." *Mellentine*, 515 F. App'x at 425. So BANA's motion to dismiss Count I is denied.

### b. Count II: BANA is not liable for breach of contract.

The Bennetts argue that BANA breached the mortgage contract by violating their duty to send the Bennetts written notice of default, acceleration, and fees imposed on the loan. R. 28 ¶¶ 56–59. Specifically, the Bennetts allege that BANA provided the Bennetts false information about the owner of their loan and misstated the status of mortgage modifications. *Id.* ¶ 57. The Bennetts also claim BANA breached in bad faith because it delayed reviews of the Bennetts' loss mitigation options and misstated the status of the Bennetts' loan. *Id.* ¶ 60. For the reasons explained below, the Court finds that the Bennetts failed to state a claim for breach of contract.

First, BANA is excused from any possible breach because the Bennetts breached the mortgage contract first by defaulting on the loan. *O'Bryan v. Mengel Co.*, 6 S.W.2d 249, 251 (Ky. 1928) ("No principle in the law of contracts is better settled than that the breach of an entire and indivisible contract in a material particular excuses further performance by the other party and precludes an action for damages on the unexecuted part of the contract."). Second, the Bennetts do not point to any particular provision that BANA breached. *See* R. 28. In order to recover for breach of contract, the Bennetts must show "the existence and the breach of a contractually imposed duty." *Strong v. Louisville & Nashville R. Co.*, 43 S.W.2d 11, 13 (Ky. 1931). The Bennetts admit that it is "100% fact" that the mortgage contained no provisions regarding loan modification. R. 45 at 3 (the Bennetts' response to BANA's motion to dismiss). Because the mortgaged contained no loan modification provisions, BANA could not have breached the mortgage by failing to evaluate the Bennetts' for a loan modification.

Instead, the Bennetts ask this Court to find a duty "between servicer and borrower in furtherance of loss mitigation." *Id.* BANA did not breach if there was no such duty imposed by law or by the contract. *Strong*, 43 S.W.2d at 13. Kentucky does impose an obligation of good faith and fair dealing in performing a contract. *Ranier v. Mount Sterling Nat. Bank*, 812 S.W.2d 154, 156 (Ky. 1991). But Kentucky law does not provide a cause of action for a breach of good faith and fair dealing outside the insurance context. *Davidson v. Amer. Freightways, Inc.*, 25 S.W.3d 94, 102 (Ky. 2000) ("[T]he tort of 'bad faith' appl[ies] only to those persons or entities (and their agents) who are engaged . . . in the business of entering into contracts of insurance." (internal quotations omitted)); *see also Ennes v. H & R. Block E. Tax Servs., Inc.*, 2002 WL 226345, at *4 (W.D. Ky. January 11, 2002) ("Kentucky courts

have not extended the tort action for breach of the covenant of good faith and fair dealing to non-insurance contracts"). The Bennetts do not cite to any Kentucky cases extending a cause of action for breach of good faith and fair dealing outside the insurance context, and they make no argument for why this Court should extend it. *See* R. 28; R. 45. As such, the breach of contract claim must be dismissed.

### c. Count III: BANA is not liable for any breach of the HAMP guidelines.

The Bennetts also fail to state a claim under the Home Affordable Modification Program ("HAMP"). Congress created HAMP under the Emergency Economic Stabilization Act of 2008, Pub. L. 110-343. *See also* 12 U.S.C.A. § 5219. HAMP was established to help struggling homeowners avoid foreclosure through loan modifications. *Rush v. Mac*, ---F. 3d---, ---, 2015 WL 4069807, at *4 (6th Cir. 2015). HAMP Servicer Participation Agreements ("SPA") require the servicer to perform certain foreclosure prevention services and loan modifications. R. 28 ¶ 70; *see also Ahmad v. Wells Fargo Bank, NA*, 861 F. Supp. 2d 818, 825 (E.D. Mich. 2012). Participating servicers must consider all loans that are eligible under HAMP, but they do not have to modify mortgages. R. 28 ¶ 70; *see also Ahmad*, 861 F. Supp. 2d at 825. If a borrower qualifies for a HAMP loan modification, the borrower does not automatically get a modification. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 557 (7th Cir. 2012). Instead, the servicer first "implement[s] a Trial Period Plan ("TPP") under the new loan repayment terms it formulated" according to the HAMP guidelines. *Id.* If a borrower successfully completes the conditions of the TPP, then the servicer has to offer a permanent modification. *Id.*

The Bennetts allege that BANA's actions violated HAMP requirements. BANA signed an SPA to participate in HAMP. R. 28 ¶ 64. The Bennetts submitted an application

to BANA for assistance under HAMP.  *Id.* ¶ 68.  BANA allegedly denied the Bennetts'

application in April 2013, *id.* ¶ 69; R 28-3 at 1, but the Bennetts claim they never received

the declination letter.  R. 28 ¶ 69.  The Bennetts assert that BANA had a duty under the

HAMP servicer participation agreement to review the Bennetts for all applicable HAMP

programs.  *Id.* ¶ 70.  The Bennetts also argue that BANA had a duty to provide them with

written notice of approval or denial of their application.  *Id.*  Therefore, the Bennetts claim

that BANA breached the HAMP guidelines, and that BANA should be liable to the Bennetts

for this breach.  *Id.* ¶ 72.

HAMP and its enabling act "do not contain a federal right of action."  *Olson v.*

*Merrill Lynch Credit Corp.*, 576 F. App'x 506, 511 (6th Cir. 2014) (quoting *Wigod*, 673 F.3d

at 555).  So the Bennetts "can only bring a HAMP-related claim if [Kentucky] law provides

one."  *Id.* (citing *Mik v. Fed. Home Loan Mortg. Corp.*, 743 F.3d 149, 166–67 (6th Cir.

2014)).  The Bennetts' claim rests solely on federal law, and they cite to no Kentucky law

that allows a third-party private action under HAMP.[1]  *See* R. 28 ¶¶ 64–73.  Therefore. the

Bennetts have failed to allege a theory that BANA owed them a contractual duty in

connection with BANA's contract with the government.  *Olson*, 576 F. App'x at 512; *see*

*also Rush*, 2015 WL 4069807, at *4.

In their response, the Bennetts concede that HAMP does not expressly create a private

right of action.  *See* R. 45 at 4.  But the Bennetts argue that this Court should create a private

right of action for breach of the duty to adequately review a borrower for loan modifications

---

[1] The Bennetts do cite to one Kentucky case, *Ranier*, 812 S.W.2d 154. R. 45 at 4. But *Ranier* does not create a private right of action for third-party beneficiaries.  Instead, *Ranier* dealt with creditor subordination agreements, in which a third-party creditor executes a subordination agreement with the creditor, the creditor "has an implied duty under equitable principles to apply the payment it receives from the debtor in a manner which does not prejudice the third-party creditor's subordinated security interest."  *Id.* at 157.

under HAMP.  *Id.*  The Bennetts claim this private right of action is rooted in the Seventh Circuit's decision in *Wigod* and the Ninth Circuit's decision in *Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878 (9th Cir. 2013).  But the Bennetts' reliance on *Wigod* and *Corvello* is misplaced.  In both cases, the plaintiffs had received a Trial Period Plan ("TPP"), but Wells Fargo refused to offer them a permanent loan modification after they successfully completed the TPP conditions.  *Wigod*, 673 F.3d at 557–59; *Corvello*, 728 F.3d at 881.  Both cases were considering whether Wells Fargo breached the TPP agreement, not the HAMP agreement.  *Wigod*, 673 F.3d at 560–61; *Corvello*, 628 F.3d at 883.  In this case, the Bennetts never qualified for a HAMP loan modification, and they never received a TPP.  So *Wigod* and *Corvello* do not apply here.

The Bennetts pled sufficient facts to state a claim under RESPA, but their claims for breach of contract and breach of the HAMP contract fail to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).  As such, BANA's motion to dismiss, R. 29, will be granted in part and denied in part.  Count II and Count III of the Bennetts' complaint, R. 28, will be dismissed.

## II.   DEFENDANT RUSHMORE'S MOTION TO DISMISS

The Bennetts bring five claims against Rushmore: (1) Rushmore violated 12 C.F.R. § 1024.36(d) of RESPA; (2) Rushmore violated 12 C.F.R. §1024.41(c) of RESPA; (3) Rushmore breached the mortgage contract; (4) Rushmore violated the Fair Debt Collection Practices Act ("FDCPA"); and (5) Rushmore made fraudulent representations to the Bennetts.  R. 28 at 16–21.  Rushmore moved to dismiss all five counts for failure to state a claim upon which relief may be granted.  R. 30 at 1 (citing Fed. R. Civ. P. 12(b)(6)).  Only the Bennetts' RESPA claims survive.

### a.   Count IV: The Bennetts state a claim under RESPA, 12 U.S.C. § 2605.

Rushmore contends that plaintiff's RESPA claim fails for two reasons.   First, Rushmore asserts that the letters came from the AG's office, not the Bennetts, so the letters did not qualify as QWRs under RESPA.   This argument fails for the same reasons that BANA's did—the AG qualifies as an agent under RESPA.   *See supra* Part I.a.

Second, Rushmore argues the Bennetts do not state sufficient facts to show that Rushmore failed to respond adequately to the Bennetts' QWRs.   R. 30 at 4–7.   This argument fails as well.   Section 2605 requires that a servicer respond to a QWR by providing the borrower "with a written explanation or clarification that includes . . . information requested by the borrower or an explanation of why the information requested is unavailable or cannot be provided by the servicer."   12 U.S.C. § 2605(e)(2)(C).   The Bennetts allege that Rushmore inadequately responded to the Bennetts' questions about the status of their loss mitigation applications.   R. 28 ¶ 78.   First, Rushmore stated that the Bennetts had been offered a proprietary trial loan modification.   *Id.*   But the Bennetts had only received a forbearance agreement, not a proprietary trial loan modification.   *Id.* at ¶¶ 25, 30.   Second, Rushmore stated that the owner of the loan was MTGLQ, which conflicted with all other information the Bennetts had.   *Id.*   These allegations are sufficient—they allege that Rushmore provided inaccurate or incomplete information, and that Rushmore failed to perform an adequate investigation to obtain the requested information.   So the Bennetts stated a plausible claim for relief under section 2605.

### b.   Count V: The Bennetts state a claim under RESPA, 12 C.F.R. § 1024.41.

The Bennetts also allege that Rushmore violated another section of RESPA, 12 C.F.R. § 1024.41.   12 C.F.R. § 1024.41 is part of Regulation X that became effective on January 10,

2014. *Campbell v. Nationstar Mortg.*, -- F. App'x --, 2015 WL 2084023, at *6 (6th Cir. 2015). It lays out the procedures that servicers are required to follow when they receive a loss mitigation application. 12 C.F.R. § 1024.41(b)–(j). If a borrower provides a complete loss mitigation application, section 1024.41 requires that a servicer "[e]valuate the borrower for all loss mitigation options available to the borrower" and "[p]rovide the borrower with a notice in writing stating . . . which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage." *Id.* at § 1024.41(c). The Bennetts allege that Rushmore decided to offer the Bennetts two loss mitigation options—a forbearance agreement, *see* R. 28-1, and a proprietary trial loan modification, *see* R. 28-2. R. 28 ¶¶ 87–88. But the Bennetts only received the forbearance agreement. *Id.* So the Bennetts argue that Rushmore violated section 1024.41(c) by failing to notify the Bennetts of both offers. *Id.* ¶¶ 90–92.

Rushmore argues section 1024.41(i) only requires a servicer to comply with section 1024.41 for a single complete loss mitigation application. 12 C.F.R. § 1024.41(i). BANA had already considered the Bennetts for a loan modification and denied them multiple times between 2010 and 2013. So Rushmore asserts that section 1024.41 does not apply to the Bennetts' case. Rushmore's argument misinterprets the statute. Section 1024.41(i) states that "[a] servicer is only required to comply with the requirements of this section for a single complete loss mitigation application for a borrower's mortgage loan account." *Id.* But section 1024.41 was not effective until 2014, after BANA considered the Bennetts for any loss mitigation options. *Campbell*, 2015 WL 2084023, at *6–7. This means that BANA never complied with the requirements of section 1024.41 in evaluating the Bennetts for loss mitigation options. As such, Rushmore was still required to comply with the requirements of

section 1024.41 at least once after the section became effective.  So section 1024.41 does apply to the Bennetts' case.

Rushmore further argues that it met the requirements of section 1024.41 by sending the Bennetts the forbearance agreement.  R. 30 at 9–10.  Rushmore asserts that it did not have a duty to extend any other offers to the Bennetts.  *Id.* at 9.  Rushmore is correct that section 1024.41 does not "impose[] a duty on a servicer to provide any borrower with any specific loss mitigation option."  12 C.F.R. § 1024.41(a).  But section 1024.41 does require a servicer to notify the borrower of the servicer's "determination of which loss mitigation options, if any, it will offer to the borrower."  12 C.F.R. § 1024.41(c)(1)(ii).  So section 1024.41 does impose a duty on a servicer to notify a borrower of all loss mitigation offers.  The Bennetts allege that Rushmore decided to offer the Bennetts two different loss mitigation options: the forbearance agreement and a proprietary trial loan modification.  R. 28 ¶¶ 87–89; *see also* R. 28-1; R. 28-2 ("Our records indicate Rushmore reviewed and approved the loan for a proprietary trial loan modification . . . .").  As such, section 1024.41(c)(1)(ii) required Rushmore notify the Bennetts of both offers.  12 C.F.R. § 1024.41(c)(1)(ii).  But the Bennetts claim they never received notice of the offer for a proprietary trial loan modification.  R. 28 ¶ 90.  So the Bennetts pled sufficient facts to state a claim that Rushmore violated section 1024.41.

Finally, Rushmore argues that plaintiffs' claim fails because the forbearance agreement and the proprietary trial loan modification both required a large payment before Rushmore would approve a final loan modification.  R. 30 at 10.  So the Bennetts would have had to pay the amount in the forbearance agreement either way.  *Id.*  Rushmore seems to claim that since the Bennetts rejected the forebearance agreement they would have also

rejected a proprietary trial loan modification that contained the same lump sum payment.  *Id.* If this is Rushmore's argument, it misconstrues the documents.  Rushmore cannot use any assumption about this as an excuse for why it never sent the Bennetts notice of both offers. *See* § 1024.41(c)(1)(ii) (requiring a servicer to "[p]rovide the borrower with a notice in writing stating . . . which loss mitigation options, if any, it will offer to the borrower").  Also, there is nothing in the letter to suggest that the payment amount would have been the same as that in the forbearance agreement.  *See* R. 28-2.  Finally, in its response to the AG's letter, Rushmore stated that it "reviewed and approved [the Bennetts'] loan for a proprietary trial loan modification."  *Id.*  Rushmore had already approved the Bennetts for the trial loan modification.  Therefore, its approval was not dependent on any large payment.  The letter goes on to state that the large payment "would not be required until you have been approved for a loan modification (which would be conditioned upon you making such a payment)." *Id.*  So the Bennetts would only be required to make the payment as a condition of the final loan modification plan.  As such, Rushmore's argument fails, and its motion to dismiss Count V will be denied.

### c.  Count VI: Rushmore is not liable for breach of contract.

The Bennetts claim Rushmore breached the mortgage contract by failing to provide the Bennetts with required information.  R. 28 ¶¶ 95–100.  Specifically, the Bennetts' claim revolves around Rushmore's failure to notify the Bennetts of the proprietary trial loan modification offer.  *Id.* ¶¶ 96–99.  The Bennetts also claim Rushmore breached in bad faith because it knowingly misstated the status of the Bennetts' loss mitigation applications.  *Id.* ¶ 60.  These claims against Rushmore fail.

Like BANA, Rushmore is excused from any possible breach because the Bennetts breached the mortgage contract first by defaulting on the loan. *See supra* Part I.c (citing *O'Bryan*, 6 S.W.2d at 251). The Bennetts concede that they breached first. R. 36 at 4. Instead, the Bennetts argue that Rushmore had a duty to notify the Bennetts of certain information as part of the general implied duties of good faith and fair dealing. *Id.* at 5. As stated earlier, Kentucky law contains no cause of action for breach of good faith and fair dealing outside the insurance context, so Rushmore cannot be held liable for breaching this alleged obligation. *See supra* Part I.b. Therefore, Rushmore's motion to dismiss Count VI will be granted.

### d. Count VII: The Bennetts fail to state a claim under the FDCPA.

The FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The Bennetts allege four violations of the FDCPA: (1) the forbearance agreement was a misleading representation of all of the Bennetts' loan mitigation options; (2) Rushmore's response to the AG's letter contained material misrepresentations; (3) Rushmore made false statements to BANA about the legal status of the Bennetts' foreclosure; and (4) Rushmore's monthly mortgage statements to the Bennetts contain misrepresentations. R. 28 ¶¶ 109–12. All of the Bennetts' claims under the FDCPA must be dismissed.

First, the forbearance agreement does not violate the FDCPA. The Bennetts do not point to any provision in the forbearance agreement that contains misrepresentations or misleading representations. Instead, the Bennetts claim that the agreement as a whole was a misrepresentation of the loss mitigation options available to them at the time. But the forbearance agreement does not suggest that it was the Bennetts' only loss mitigation option.

*See* R. 28-1.   The forbearance agreement only presents the terms for this specific loss mitigation option.  *Id.*  Even if the Bennetts should have also received a proprietary trial loan modification from Rushmore, that fact does not make the forbearance agreement itself misleading.  *See Miller v. Javitch, Block, & Rathbone*, 561 F.3d 588, 595 (6th Cir. 2009) (holding that a court "read[s] the [document] in its entirety and give[s] it a common sense appraisal" to determine if the document is misleading (internal quotations omitted)).

Rushmore's response to the AG's letter also does not violate the FDCPA.  To violate the FDCPA, the misrepresentations must be made "in connection with the collection of any debt."  15 U.S.C. § 1692e.  The FDCPA does not apply to every communication between a debtor and a debt collector.  *Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011) (citation omitted).  The FDCPA only applies to a communication if "an animating purpose of the communication [is] to induce payment by the debtor."  *Id.* (citation omitted). A "ministerial response to a debtor inquiry" does not have an animating purpose to induce payment.  *Id.*  In this case, the AG's letter was a debtor inquiry into the status of the mortgage and any loss mitigation options.  R. 28 ¶ 27.  Rushmore's response was simply a "ministerial response" to this inquiry.  *See* R. 28-2.  In the response, Rushmore makes no attempt to induce payment from the Bennetts.  *See id.*  So the FDCPA does not apply to Rushmore's response.

Similarly, Rushmore's statements to BANA (as reflected in BANA's response to the AG) do not violate the FDCPA.  BANA only reached out to Rushmore for more information about the loan's status, not to induce payment from the Bennetts.  *See* R. 28-3 at 1–2. Because Rushmore did not provide that information to BANA to induce payment from the Bennetts, the FDCPA does not apply to these statements.  *See Grden*, 643 F.3d at 173.

Finally, the monthly mortgage statement that Rushmore sent to the Bennetts does not violate the FDCPA.  The complaint only contains a vague statement that Rushmore's monthly mortgage statements "contain misrepresentations based on their responses to the Attorney General which are direct attempts to collect a debt which Rushmore has every reason to know is a misstatement."  R. 28 ¶ 111.  On its face, the monthly mortgage statement does not appear to contain any misrepresentations or material that conflicts with Rushmore's response to the AG's letter.  *See* R. 28-6 (monthly mortgage statement).  And the Bennetts do not point to anything in the monthly mortgage statement that is a misrepresentation. *See* R. 28. So the Bennetts' claim fails. *See Blackburn v. Fisk Univ.*, 443 F.2d 121, 123 (6th Cir. 1971) (holding that a court is "not bound by allegations that are clearly unsupported and unsupportable" (citations omitted)).

### e.  Count VIII: Fraudulent Misrepresentation

The Bennetts fail to state a claim for fraudulent misrepresentation as well.  A claim of fraud under Kentucky law includes six elements: that (1) the defendant made a material representation to the plaintiffs, (2) the representation was false, (3) the defendant knew that it was false or made it recklessly, (4) the defendant made the misrepresentation to induce the plaintiff to act, (5) the plaintiff relied on it, and (6) suffered injury as a result.  *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).  To survive a motion to dismiss, claims of fraud must satisfy the heightened pleading standard in Federal Rule of Civil Procedure 9(b).  *Minger v. Green*, 239 F.3d 793, 800 (6th Cir. 2001).  This means that "the circumstances constituting fraud . . . shall be stated with particularity."  *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001).  It is not enough to offer "[g]eneralized and conclusory" recitations of the elements.  *Id.*  Instead, a plaintiff must plead facts showing

that the defendant's actions satisfy each element of the claim.  *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 471–72 (6th Cir. 2011) (affirming dismissal based on failure to plead one element of fraud sufficiently).

The Bennetts make three arguments for fraudulent misrepresentation.  First, the Bennetts claim that Rushmore's statements in the response to the AG's letter about the proprietary trial loan modification were misrepresentations.  *Id.* ¶¶ 115, 117.  This claim fails because the Bennetts do not state sufficient facts to plead the fifth and sixth elements of fraud.  Even if Rushmore's statements were false, the Bennetts do not assert how they relied on these statements.  In the absence of particularized factual allegations showing reliance, the Bennetts fail to plead a claim for fraud.  *Evans v. Pearson Enterprises, Inc.*, 434 F.3d 839, 852 (6th Cir. 2006) (holding that a plaintiff "failed to plead reliance sufficiently and therefore is unable to state a claim for fraud" despite alleging in "her complaint that she 'relied implicitly on the representations'").  The Bennetts also failed to assert how any reliance on Rushmore's statements injured them.  The Bennetts' main argument for injury is that they never received the proprietary trial loan modification offer.  R. 28 ¶¶ 119–20.  But this injury did not result from the Bennetts' reliance on Rushmore's statements in Rushmore's response to the AG's letter—all Rushmore's statements did was alert the Bennetts to the existence of the proprietary trial loan modification offer.  So the Bennetts did not adequately plead injury.

Second, the Bennetts seem to argue that the forbearance agreement they received from Rushmore was a fraudulent misrepresentation of their loss modification options.  *See id.*  As discussed in Part II.c, the forbearance agreement contained no statements regarding other loss mitigation options, and the agreement does not claim to be the Bennetts' only

option.  *See* R. 28-1.  The Bennetts fail to point to a single representation in the document that is false.  *See* R. 28.  So the Bennetts do not state a claim for fraud.  *Eidson v. State of Tennessee Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007) (citing *Twombly*, 550 U.S. at 555) ("Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.").

Finally, the Bennetts claim that Rushmore's statements to BANA were fraudulent misrepresentations.  This claim also fails.  Rushmore made these claims to BANA, not the Bennetts, so the Bennetts insufficiently pled the first element of fraud.  *See Ashland*, 648 F.3d at 471 (noting that the first element of fraud in Kentucky requires "the declarant made a material representation to the plaintiff").  Moreover, the Bennetts fail to plead any facts in support of the last three elements of fraud.  The Bennetts do not allege how Rushmore made these statements to BANA in order to induce the Bennetts to act.  *See* R. 28.  The Bennetts also do not even attempt to assert how they relied on these misrepresentations, or how this reliance caused them injury.  *See id.*  Without any particularized factual allegations for any of these elements, the Bennetts' claim for fraud must fail.  *See Evans*, 434 F.3d at 852; *Eidson*, 510 F.3d at 634.

### f.  *Rooker-Feldman* abstention does not apply

At the end of its brief, Rushmore quickly mentions that this Court should abstain from this case under the *Rooker-Feldman* doctrine.  As Rushmore states, *Rooker-Feldman* is limited to federal cases "brought by state-court losers complaining of injuries caused by state-court judgments . . . and inviting district court review and rejection of those judgments."  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 294 (2005); *see also* R. 30 at 21.  The Bennetts are not asking this Court to "review and reject" the state court

foreclosure judgment. *Id.* Instead, this action revolves around alleged misconduct committed by the defendants after the state court judgment went into effect. *See* R. 28 (alleging conduct that occurred after December 22, 2009). So *Rooker-Feldman* abstention does not apply here.

The Bennetts only pled sufficient facts to support the RESPA claims against Rushmore. The Bennetts failed to state a claim for breach of contract, violation of the FDCPA, and fraudulent representation. Therefore, Rushmore's motion to dismiss, R. 30, will be granted in part and denied in part. The Court will dismiss Counts VI, VII, and VIII of the Bennetts' complaint, R. 28, as they pertain to Rushmore.

## III.   DEFENDANT MTGLQ'S MOTION TO DISMISS

The Bennetts bring one claim against MTGLQ: fraudulent misrepresentation. Specifically, they argue that Rushmore's misrepresentations about the Bennetts' loss mitigation options were based on MTGLQ's guidelines and instructions. R. 28 ¶ 121. The Bennetts also allege that MTGLQ "knowingly and reckless[ly] allowed Rushmore to misconstrue the [Bennetts'] loss mitigation options." *Id.* This claim fails because the Bennetts do not plead any of the elements of fraud. First, they do not point to a single representation MTGLQ made directly to them. *See Ashland*, 648 F.3d at 471. Second, the Bennetts do not assert: (1) that any of these representations were false, (2) that MTGLQ knew the representations were false or made recklessly, (3) that MTGLQ made the representations to induce the Bennetts to act, (4) that the Bennetts relied on the representations, or (5) that the Bennetts were injured based on this reliance. As such, the Bennetts fail to state a claim for fraud against MTGLQ, so MTGLQ's motion to dismiss will be granted.

## CONCLUSION

Accordingly, it is **ORDERED** that:

(1)      Bank of America's motion to dismiss, R. 29, is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, Bank of America's motion to dismiss is **DENIED** with respect to Count I of the complaint, R. 28**.**

(2)      Rushmore's motion to dismiss, R. 30, is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, Rushmore's motion to dismiss is **DENIED** with respect to Counts IV and V of the complaint, R. 28**.**

(3)      MTGLQ's motion to dismiss, R. 31, is **GRANTED**.

(4)      Counts II, III, VI, VII, and VIII of the Bennetts' complaint, R. 28, are **DISMISSED WITHOUT PREJUDICE**.

This the 26th day of August, 2015.

**Signed By:**

**_Amul R. Thapar_** AT

**United States District Judge**